152 F.3d 1368
 47 U.S.P.Q.2d 1732
 MANTECH ENVIRONMENTAL CORPORATION, (successor in interest to
CleanOX Environmental Services, Inc.), Plaintiff-Appellant,
v.
HUDSON ENVIRONMENTAL SERVICES, INC., and Geo-Cleanse
International, Inc., Defendants-Appellees,
and
James T. Wilson, Andrew Kondracki, Cedar Environmental,
Inc., Gerard K. Donnelly, Leonard S. Bellezza, and
Richard Malgran, Defendants.
 No. 98-1079.
 United States Court of Appeals,
Federal Circuit.
 Aug. 13, 1998.
 
 Thomas H. Shunk, Baker & Hostetler LLP, Cleveland, OH, argued, for plaintiff-appellant. With him on the brief was Lisa Hammond Johnson.
 Joseph S. Presta, Sixbey, Friedman, Leedom & Ferguson, McLean, VA, argued, for defendants-appellees. Of counsel was Edward J. Kondracki, Kerkam, Stowell, Kondracki & Clarke, P.C., Falls Church, VA.
 Before MICHEL, CLEVENGER, and SCHALL, Circuit Judges.
 MICHEL, Circuit Judge.
 
 
 1
 Mantech Environmental Corporation ("Mantech") appeals the decision of the United States District Court for the District of New Jersey in Cleanox Environmental Services, Inc. v. Hudson Environmental Services, Inc., No. 96-5754 (D.N.J. Dec. 12, 1997),[1] holding, based on the claim construction determined in an October 14, 1997 "Markman hearing," that defendants Hudson Environmental Services, Inc., ("Hudson") and Geo-Cleanse International, Inc. ("Geo-Cleanse") (collectively, "Defendants")[2] were entitled to summary judgment of noninfringement of the asserted method claims of United States Patent Nos. 5,286,141 (the " '141 patent") and 5,520,483 (the " '483 patent").[3]
 
 
 2
 The only issues on appeal relate to the claims of patent infringement against Hudson and Geo-Cleanse. Based on a partial settlement agreement, all of the other claims of all parties were dismissed with prejudice at the time of trial, except that in case of remand from this court, Defendants reserved the right to challenge the validity of the patents in suit. Cleanox, slip op. at 5-6 n. 5.
 
 
 3
 This appeal was submitted for our decision following oral argument on June 1, 1998. We hold that the district court erred in construing the claim term "well," which appears in both of the asserted claims of the two patents, as "a structure which enables both monitoring and injecting the groundwater," id. at 26 (emphasis added), when the correct construction is a structure which enables either monitoring or injecting the groundwater, or both. It is undisputed that in Defendants' system all of the wells do not perform both functions. Because under the correct construction, however, Defendants' system could infringe, we vacate the district court's summary judgment of noninfringement and remand the case for further proceedings consistent with this opinion. We affirm, however, the district court's summary judgment insofar as it is based on the construction that the steps of claim 1 of the '483 patent must be performed in sequence.
 
 BACKGROUND
 
 4
 Mantech brought this suit for patent infringement and other causes of action against Defendants on December 11, 1996. The other causes of action were settled and dismissed. Summary judgment of noninfringement was entered by the district court on the basis of claim construction. Invalidity and other issues relating to infringement were not decided. The only issue on appeal then is the correctness of the claim construction.
 
 
 5
 The '483 patent issued from a continuation-in-part of the application which issued as the '141 patent and hence has a very similar disclosure. Both patents are directed toward similar methods for remediating a hydrocarbon-contaminated region of a subterranean body of groundwater to eliminate or reduce the concentration levels of hydrocarbon contaminants. The text of claim 1 of the '141 patent is set forth below,[4] and the text of the other asserted claim, claim 1 of the '483 patent, is set forth at note 13, post.
 
 
 6
 Immediately prior to trial, the district court conducted a Markman hearing. At the hearing, each party presented testimony from an expert witness in the relevant technical field.[5] The experts agreed that, generally, the meaning in the art of the claim term "well," was "a device that provides access to groundwater." Id. at 21. The experts did not agree, however, that the established meaning should be applied in the construction of "well" as used in the claims at issue. Although Mantech's witness testified that he would ascribe no other meaning to the claim term "well" than the general meaning in the art, Hudson's witness testified that he would ascribe a more limited meaning based on the written descriptions and the claims of the patents in suit. Hudson's witness testified that the claim term "well" should be limited to a "dual-purpose well[ ]," one that both injects and monitors.
 
 
 7
 At the conclusion of the hearing, the district court orally rendered its claim construction and reserved the right to supplement the oral opinion in writing pursuant to Rule 52.1 of the Local Rules for the United States District Court for the District of New Jersey. The district court further noted that the testimony of the witnesses was used only for background in the technology and that in reaching its decision the district court relied only upon the patents.[6] In the December 1997 written opinion, the district court construed the disputed claim terms as follows:
 
 
 8
 (1) the term "well" in Claim One of the '141 Patent means "a structure used for both monitoring and injecting the groundwater", ... and (3) Claim One of the '483 Patent is read to require the performance of Steps A-D both separately and sequentially to practice the invention.
 
 CleanOX, slip op. at 43-44.[7]
 
 9
 Following opening statements to the jury, Mantech informed the court that based on the court's construction of the term "well," Mantech would be unable to present a prima facie case of infringement of the asserted claims. See Transcript of Hearing, Oct. 14, 1997, at 82. Upon a joint, oral motion of the parties, the court granted summary judgment of noninfringement to Defendants, effectively on the basis of its claim construction.
 
 
 10
 Mantech timely appealed to this court. Defendants cross-appealed, but the cross-appeal was dismissed by this court because none of the issues asserted in the cross-appeal was decided by the district court adversely to Defendants. See cleanOX Envtl. Servs., Inc. v. Hudson Envtl. Servs., Inc., No. 98-1079, 1998 WL 130703, at * 1 (Fed.Cir. Feb.23, 1998). We have jurisdiction over the appeal under 28 U.S.C. § 1295(a) (1994).
 
 DISCUSSION
 
 11
 Claim construction is a question of law, reviewed non-deferentially on appeal. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456, 46 U.S.P.Q.2d 1169, 1174 (Fed.Cir.1998) (in banc) (holding "we review claim construction de novo on appeal"). When construing a claim, a court principally consults the evidence intrinsic to the patent, including the claims, the written description, and any relevant prosecution history. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582-83, 39 U.S.P.Q.2d 1573, 1576-77 (Fed.Cir.1996). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). Where the determination of infringement turns solely on the legal question of the proper construction of the claims, summary judgment is appropriate. See Laitram Corp. v. Morehouse Indus., Inc., 143 F.3d 1456, 1462, 46 U.S.P.Q.2d 1609, 1613 (Fed.Cir.1998) (citing Gentex Corp. v. Donnelly Corp., 69 F.3d 527, 530, 36 USPQ2d 1667, 1669 (Fed.Cir.1995) ("Claim interpretation is a question of law amenable to summary judgment.")).
 
 
 12
 I. Construction of the Term "Well" in the Two Patents
 
 
 13
 It appears to us from the evidence presented on appeal that there are three possible constructions of the claim term well, only one of which is proper: (1) a device that allows access to groundwater (Mantech's asserted construction); (2) a structure that enables either monitoring or injecting of the groundwater (Mantech's fallback construction asserted at oral argument); and (3) a structure used for both monitoring and injecting the groundwater (Hudson's and the district court's construction).
 
 
 14
 The district court relied solely on the intrinsic evidence in arriving at its claim construction. CleanOX, slip op. at 26. The district court reasoned that although the term "well" "is not defined in the claim, the specification may be used as a dictionary to explain the invention and interpret the claims." Id. at 25. The court further determined that "[a]lthough nothing in the specification requires that the wells be used for both purposes, implicit in it is that the wells be used in such a fashion." Id. at 26 (second emphasis added).
 
 
 15
 Mantech relies on the testimony at the Markman hearing of both its independent expert witness and Hudson's independent expert witness as to the established meaning of the term "well" to those of ordinary skill in the art. According to Mantech, this definition is not expressly modified by anything in the specification, and the written description does not provide any specialized definition for the term "well." Thus, argues Mantech, the district court was required to adopt this meaning.
 
 
 16
 Hudson responds, however, that a construction of "well" as "any device that allows access to groundwater" would be overly broad and would ignore contrary intrinsic evidence in violation of the tenets of Vitronics, 90 F.3d at 1583, 39 USPQ2d at 1577.
 
 
 17
 At oral argument, Mantech all but abandoned the definition of "well" that would equate it with access to groundwater and maintained that a structure that could either inject or monitor satisfies the term "well" as used in the claims and does not contradict the written description. According to Hudson, however, if each of the wells in the claimed system cannot perform both monitoring and injecting functions, the method of the invention cannot be practiced as claimed. Thus, Hudson asserts that Mantech's fall-back argument that the wells do have to provide not only access to the groundwater, but also either monitoring or injecting, contradicts the plain meaning of the claims and the written description, and thus violates Vitronics. On the other hand, Mantech's primary argument, that the court must accept the plain meaning of the term "well," implies that Vitronics requires reliance on the extrinsic evidence.
 
 
 18
 The main issues on appeal, therefore, are (1) whether it was legally correct claim construction methodology under Vitronics for the district court to accept the extrinsic evidence as background information, but reject it as the basis for construing the claims and construing the claims solely on the basis of the intrinsic evidence; and (2) whether, assuming the court did not violate Vitronics, the "dual-function" construction is correct.
 
 A. Limited Reliance on Extrinsic Evidence
 
 19
 Both Mantech and Hudson argued before the district court that the dispute over the proper meaning of the claim term "well" could be resolved without resorting to extrinsic evidence. See CleanOX, slip op. at 4-5 n. 3. However, each side presented the testimony of an expert witness in case the court determined that extrinsic evidence was necessary. At the conclusion of the Markman hearing, however, the court advised the parties that the expert testimony "was accepted only for the purpose of background in the technical area" and construed the claims at issue based solely upon the intrinsic evidence. Id. at 5.
 
 
 20
 Mantech asserts on appeal that the established definition of "well" comports fully with the patents' specifications. Therefore, according to Mantech, the district court erred in not applying the established meaning. Mantech implies that under a proper interpretation of Vitronics, the district court was obligated to rely on the extrinsic evidence here.
 
 
 21
 Hudson responds that the extrinsic evidence of the established meaning of the term "well" contradicts the meaning taught by the specifications. Hudson contends that relying on such expert testimony would require ignoring clear intrinsic evidence and improperly basing the construction instead on contrary extrinsic evidence, the expert testimony, in violation of Vitronics. Hudson asserts, therefore, that it would have been improper for the judge to rely on expert testimony for more than background in the relevant art and the patents in suit because the intrinsic evidence unambiguously reveals a different meaning of the term "well." In addition, Hudson argues that because the witnesses disagreed, the extrinsic evidence on application of the established meaning to the claim term is in conflict. Further, asserts Hudson, Mantech did not establish that the term "well" as used in the patent was ambiguous and could not be interpreted without extrinsic evidence, another requirement of Vitronics.
 
 
 22
 The district court agreed with Hudson that "[t]he words of the claim and the specification adequately describe the scope of the term 'well,' " as used in the patents. CleanOX, slip op. at 25. Therefore, after admitting the extrinsic evidence as background in the relevant technology, the court held that the written description and the claims were not ambiguous and that the meaning of the claim term "well" was clear. See id. at 26-27. The district court, therefore, correctly followed the guidance set forth in Vitronics for limiting reliance on contrary extrinsic evidence.
 
 
 23
 Mantech's argument, that the court should have relied on expert testimony which, we hold, contradicts the plain meaning of the specification and would result in exactly what Vitronics and prior cases cited therein forbid. See Vitronics, 90 F.3d at 1584, 39 U.S.P.Q.2d at 1578 ("[A]s we have recently re-emphasized, extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language.") (emphasis added) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 981, 34 U.S.P.Q.2d 1321, 1331 (Fed.Cir.1995), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)); see also Bell and Howell Document Management Prods. Co. v. Altek Sys., 132 F.3d 701, 706, 45 U.S.P.Q.2d 1033, 1038 (Fed.Cir.1997) (holding that when the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence for purposes of claim construction).
 
 
 24
 In this case, the district court was legally correct both in admitting and accepting the testimony of the parties' expert witnesses "for the purpose of background in the technical area at issue," CleanOX, slip op. at 5, and then basing its claim construction solely upon intrinsic evidence. Although this information always may be admitted by the trial court to educate itself about the patent and the relevant technology, the claims and the written description remain the primary and more authoritative sources of claim construction. Thus, they always must be considered and where clear must be followed. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 981, 34 U.S.P.Q.2d 1321, 1331 (Fed.Cir.1995), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (holding extrinsic evidence may be used for the court's understanding of the patent); see also Cybor, 138 F.3d at 1454 n. 3, 46 U.S.P.Q.2d at 1173 n. 3. In this case, the claims and written descriptions are dispositive, for they clearly define a "well" more narrowly than the extrinsic evidence. Therefore, it was not legal error as Mantech proposes for the district court to refuse to rely on the expert testimony for anything more than background.
 
 
 25
 B. Construction of the Term "Well"
 
 
 26
 Mantech here challenges the district court's construction of the claim term "well." According to Mantech, the district court improperly limited "well" as used in the claims to the dual-function structure disclosed in the preferred embodiment. Mantech initially asserts on appeal that the proper construction of the term "well" as used in the patents in suit is "any device that allows access to groundwater." Mantech refers specifically to the '141 patent at column 6, lines 20-24, which states that "[i]t will be appreciated that a monitoring flow can be withdrawn from the well, as can a treating or test flow be injected via the well into the groundwater which the well intersects," to show that a "well" as used in the patents does not have to both monitor and inject. Mantech emphasizes the use of the word "can" in the specification instead of "must" or "shall" to indicate that each function is possible but is not required.
 
 
 27
 Hudson asserts that another patent term, "borehole," describes a structure by which groundwater merely is accessed, and applying that construction to "well" would make use of the term "borehole" elsewhere in the specification unnecessary and hence contrary to the expressed intent of the inventor.
 
 
 28
 Under proper claim construction methodology, we look first to the language of the claims. See Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 619, 34 U.S.P.Q.2d 1816, 1819 (Fed.Cir.1995). For example, step (a) of claim 1 of the '141 patent requires:(a) providing a plurality of mutually spaced wells intersecting said groundwater region;
 
 
 29
 '141 pat., col. 8., ll. 27-28. This limitation itself requires neither monitoring nor injecting at any of the mutually spaced wells. Step (b), however, requires:
 
 
 30
 (b) determining the existence of acceptable continuity and well interflow paths for said region by generating a test flow of a solution of hydrogen peroxide from one of said wells and monitoring pH changes at each other of said wells as a function of time to detect a pH drop of at least 0.2; and[8]
 
 
 31
 Id. at col. 8, ll. 29-34 (emphasis added). The emphasized phrases indicate that one well must be used for testing, i.e., injecting the test fluid, and the rest of the wells for monitoring. Step (c) then requires:
 
 
 32
 (c) subsequent to detecting said pH drop, providing a treating flow of said hydrogen peroxide solution from one or more of said wells.
 
 
 33
 Id. at col. 8, ll. 35-37 (emphasis added). The second emphasized phrase indicates that only one well need be used for providing the treating flow, i.e., injecting the treating flow; all the wells need not inject. Indeed, all but that one well could merely monitor. Step (c), therefore, could read on several alternative systems, ones with only dual function wells, ones with only single function wells, and ones with some single function and some dual function wells. For example, in an array of four wells, well A might inject only and wells B, C, & D monitor only. First, A would inject the test fluid while the others monitored. Then, A would inject the treating fluid. Claim 1 would read literally on this system.
 
 
 34
 As the district court correctly determined, therefore, a method in which all of the wells both monitored and injected would be covered by this claim. Mantech, however, conceded at trial that Defendants' wells do not all perform both functions. The construction of "well" originally asserted by Mantech, i.e., "any device that provides access to groundwater," is too broad because it would include structures that neither monitor nor inject. All the "wells" recited in claim 1 perform at least one such function. A structure which merely provides access, therefore, is not a "well" covered by claim 1. A system incorporating wells that either monitor or inject and possibly, but not necessarily, do both, however, still would be covered by claim 1 of the '141 patent and claim 1 of the '483 patent.[9]
 
 
 35
 Finally, we must look to the written description, to determine what one of ordinary skill in the art at the time of the invention would have understood the term as used in the patent to mean.[10] See Markman, 52 F.3d at 983, 34 U.S.P.Q.2d at 1335. If the written description supports the definition of the term that is apparent from the claim limitation, then reading in a further limiting definition would be improper.
 
 
 36
 The wells are introduced in the written description as "monitoring and injecting wells," '141 pat., col. 5, ll. 34-35, and, indeed, the preferred embodiment of the invention as shown in Figure 3 discloses a well that both monitors and injects. This passage is consistent with the wells as performing both monitoring and injecting; it hardly mandates, however, that each and every well used to perform the method must both inject and monitor. Later it is stated that "a monitoring flow can be withdrawn from the well, as can a treating or test flow be injected via the well into the groundwater which the well intersects." Id. at col. 6, ll. 20-24. This passage indicates that the inventor expressed an intent that a well be used for either injecting or monitoring, or both.
 
 
 37
 Hence, although the definition of "well" adopted by the district court, "a structure used for both monitoring and injecting the groundwater," CleanOX, slip op. at 43, may at first seem to be in accordance with the language of the specification, it is actually narrower than that intended by the inventor when the entire patent is read in light of the nature of the invention as described and claimed. The claims do not require such a narrow construction of the term "well" and neither does the written description. In fact, both support a broader construction.
 
 
 38
 The district court erred because it, in essence, incorporated from the preferred embodiment into the claims a narrow definition for the claim term "well," as "a structure used for both monitoring and injecting groundwater." CleanOX, slip op. at 43 (emphasis added). In the context of the written description and the claims, however, it is clear that the term "well" has a more inclusive meaning than that given by the district court: as used in the patents, a "well" is a structure connecting the surface to the groundwater that can either monitor or inject, or both, but it need not do both.
 
 
 39
 We thus hold that the meaning of the claim term "well" in the patents in suit is a structure that enables either monitoring or injecting of groundwater, or both.[11] Therefore, the methods practiced by the Defendants could indeed infringe the patents, contrary to the district court's summary judgment. We therefore vacate the district court's summary judgment of noninfringement and remand the case for further determination of infringement consistent with the correct claim construction.[12]
 
 
 40
 II. Performance of the Steps of Claim 1 of the '483 Patent Sequentially
 
 
 41
 The text of claim 1 of the '483 patent is set forth below.[13] The district court determined that the plain language of claim 1 of the '483 patent demonstrates that the steps must be performed in order. See CleanOX, slip op. at 41. Mantech argues on appeal, however, as it did before the district court, that there is no language in the claim and no mandate elsewhere in the specification requiring performance of the steps of the claimed method in sequence. According to Mantech, the steps of claim 1 of the '483 patent could be performed in any order, or simultaneously. We disagree. Step (a) provides the wells. No monitoring or injecting of the groundwater can occur until wells are provided; hence, step (a) must be performed first.[14] Step (b) introduces acetic acid, via the wells provided in step (a), into the groundwater of the contaminated region. Hence, in order to accomplish step (b), the wells of step (a) must already have been provided. Step (c) introduces an aqueous solution of ferrous ion into said groundwater region for mixing with "said acidified groundwater " (emphasis added). In order for the aqueous solution to mix with the acidified groundwater, the acid must have already mixed with the groundwater to form acidified groundwater. Hence step (b) necessarily comes before step (c). Step (d) introduces a treating flow of hydrogen peroxide solution into the groundwater. The hydrogen peroxide solution undergoes a Fenton-like reaction "in the presence of said acidic conditions and said ferrous ion." Because the acidic conditions and the ferrous ion must be present before the hydrogen peroxide can undergo the Fenton-like reaction, step (d) must come after both steps (b) and (c). We hold, therefore, that the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise.[15]
 
 
 42
 Mantech further asserts that dependent claim 4 of the '483 patent supports its argument that the steps of claim 1 need not be performed in sequence.[16] According to Mantech, claim 4 discloses introducing the treating flows separately, and separating them with flows of potable water. Relying on the doctrine of claim differentiation, Mantech asserts that because independent claim 1 must be broader than dependent claim 4, it must include a simultaneous introduction of the reagents. Mantech's argument is flawed, however, because the steps defined in claim 4 of injecting potable water into the groundwater alone distinguish the scope of claim 4 from that of claim 1 and thus make Mantech's argument based on claim differentiation unavailing. In any event, we hold that the plain meaning of claim 4 actually supports rather than refutes the sequentiality requirement of claim 1. Therefore, we uphold the district court's construction that the process steps as claimed in this patent must be performed sequentially. Because it appears on appeal that the accused system may not follow the same sequence of steps, it may not infringe the '483 patent even if it is found to infringe the '141 patent. But, once again, we cannot definitively resolve this issue on appeal given the absence of any record evidence on the sequence of steps in the accused system. Thus, we must remand on this issue as well.
 
 CONCLUSION
 
 43
 We approve the district court's construction that the steps of claim 1 of the '483 patent must be performed in sequence. However, because we hold that the district court's construction of the claim term "well" as used in both claim 1 of the '141 patent and claim 1 of the '483 patent is incorrect as too narrow, and we are not able to determine infringement here based on the correct claim construction, we vacate the summary judgment of noninfringement and remand the case for further litigation of possible infringement of both patents and other issues such as validity and damages, as appropriate.
 
 
 44
 AFFIRMED-IN-PART, VACATED-IN-PART and REMANDED.COSTS
 
 
 45
 Each party shall bear its own costs.
 
 
 
 [1]
 Mantech is the successor-in-interest to the patents in suit which were formerly owned by CleanOX TM Environmental Services, Inc. ("CleanOX TM"). For clarity, hereinafter CleanOX TM and Mantech will both be referred to as "Mantech."
 
 
 [2]
 Mantech also named as defendants: James Wilson, Andrew Kondracki, Gerard Donnelly, Leonard Bellezza, Richard Malgran, several "John Does," and Cedar Environmental, Inc. All of these additional defendants were dismissed as to all claims by agreement of the parties
 
 
 [3]
 The district court's claim construction was rendered orally after the Markman hearing on October 14, 1997, and supplemented by the above-cited written opinion. Counsel informed this court at oral argument on June 1, 1998, that on May 27, 1998, the district court published a second supplemental written opinion, modifying its analysis somewhat, but reaching the same conclusions. This second supplemental opinion is not part of the record on appeal, and the parties have not had an opportunity to brief this court on its contents. Therefore, we review only the October 14, 1997 oral ruling and the December 12, 1997 written decision of the district court
 
 
 [4]
 Claim 1 of the '141 patent:
 
 
 [1]
 A method for remediating a hydrocarbon-contaminated region of a subterranean body of groundwater to destroy or reduce the initial concentration levels of hydrocarbon contaminants, comprising the steps of:
 (a) providing a plurality of mutually spaced wells intersecting said groundwater region;
 (b) determining the existence of acceptable continuity and well interflow paths for the said region by generating a test flow of a solution of hydrogen peroxide from one of said wells and monitoring pH changes at each other of said wells as a function of time to detect a pH drop of at least 0.2; and
 (c) subsequent to detecting said pH drop, providing a treating flow of said hydrogen peroxide solution from one or more of said wells.
 '141 pat., col. 8, ll. 23-38.
 
 
 [5]
 Mantech presented testimony by its independent expert. Defendants presented testimony by the president of Geo-Cleanse and deposition testimony of an independent expert
 
 
 [6]
 During prosecution, no amendments were made to either of the claims at issue to obtain their allowance, and there is no other relevant file history to aid in the claim construction
 
 
 [7]
 In the May 1998 second supplemental opinion, the district court further clarified and refined its claim construction adding specifically that the definition of "well" applied to the '141 patent is the same definition applied to the '483 patent, and further defining step (b) of the '141 patent to require "that pH be monitored for the particular purpose of determining the existence of acceptable continuity and well interflow paths." Cleanox Envtl. Servs., Inc. v. Hudson Envtl. Servs., Inc., 14 F.Supp.2d 601, 614 (D.N.J.1998). As mentioned ante, because here the May 1998 opinion was rendered after the judgment was appealed, we do not review the further refinements added by the district court
 
 
 [8]
 We construe "generating" to be synonymous with "injecting" as is "providing," used later
 
 
 [9]
 Providing an additional structure that neither monitors nor injects, however, does not necessarily remove the accused method from the scope of the claims simply because such a structure would not be a "well" as defined in the patents. See A.B. Dick Co. v. Burroughs Corp., 713 F.2d 700, 703, 218 U.S.P.Q. 965, 967-68 (Fed.Cir.1983) ("It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device.")
 
 
 [10]
 As mentioned above, there is no relevant prosecution history
 
 
 [11]
 We note that this construction also is in accordance with the specification and claims of the '483 patent
 
 
 [12]
 We lack information on the accused methods. This case was terminated essentially on the basis of the Markman hearing. Although there was an oral motion for summary judgment based on Mantech's concession it could not prove infringement using the district court's claim construction, no written pleadings or supporting affidavits or depositions were submitted regarding infringement. Thus, we cannot consider on appeal whether as a matter of law the accused system(s) infringe(s) one or both asserted claims
 
 
 [13]
 Claim 1 of the '483 patent:
 
 
 [1]
 A method for remediating a hydrocarbon-contaminated region of a subterranean body of groundwater to destroy or reduce the initial concentration levels of hydrocarbon contaminants, comprising the steps of:
 (a) providing a plurality of mutually spaced wells intersecting said groundwater region;
 (b) providing a treating flow of acetic acid from one or more of said wells into said groundwater region, to establish acidic conditions therein;
 (c) introducing a turbulent flow of an aqueous solution of ferrous ion into said groundwater region, for mixing with said acidified groundwater, thereby providing a catalyst for disassociation of hydrogen peroxide; and
 (d) providing a treating flow of hydrogen peroxide solution from one or more of said wells into said groundwater region, said hydrogen peroxide undergoing a Fenton-like reaction in the presence of said acidic conditions and said ferrous ion to generate hydroxyl free radicals for oxidizing said contaminants.
 '483 pat., col. 9, ll. 33-51.
 
 
 [14]
 Plaintiff conceded at oral argument that step (a) must come first but continued to assert that the subsequent steps can be performed in any order, or simultaneously
 
 
 [15]
 Mantech asserts that Figure 3 of both patents shows the steps being performed simultaneously. We disagree. Figure 3 shows all of the parts of the system, but it does not disclose information about the sequence of its operation
 
 
 [16]
 Claim 4 of the '483 patent reads:
 
 
 [4]
 A method in accordance with claim 1, wherein between steps (b) and (c) and between steps (c) and (d) potable water is injected from the same said wells in place of acetic acid and ferrous ion solutions, to provide a transient buffer zone between the compositions introduced during steps (b), (c) and (d), thereby delaying the reaction of step (d) until the plume of injected miscible reactants has extended further into said groundwater region
 '483 pat., col. 9, ll. 60-67.